UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
X----------------------------------------------------------------X

JASWINDER SINGH, BALBIR NAGI, MAN SINGH,
and NYC YELLOW CAB DRIVERS ASSOCIATION
INC.,

                                    Plaintiffs,        **15 Civ. 5496 (FB) (VMS)**

              -against-

MEERA JOSHI, THE NEW YORK CITY TAXI AND
LIMOUSINE COMMISSION, BILL DE BLASIO and
THE CITY OF NEW YORK,

                                    Defendants.
X----------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

Daniel L. Ackman
Law Office of Daniel L. Ackman
222 Broadway, 19th Floor
New York, NY 10038
(917) 282-8178
d.ackman@comcast.net

Andrew St. Laurent
Harris, O'Brien, St. Laurent & Chaudhry LLP
111 Broadway, Suite 1502
New York, NY 10006
Tel: (646) 248-6010
andrew@harrisobrien.com

Counsel for Plaintiffs

October 29, 2015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

FACTUAL BACKGROUND ................................................................................. 2

    Plaintiff Taxi Drivers and the Medallion System ........................................ 2

    Non-Medallion Taxis ................................................................................... 4

    The Advent of Restricted Medallions .......................................................... 5

    The Economics of Independent Medallion Ownership ................................ 6

    The Noel Litigation and the Second Circuit Ruling .................................... 7

    The Noel Settlement Scheme ....................................................................... 9

    The Taxicab Improvement Fund .................................................................. 12

    The Rise of E-hail Taxis and their Exclusion from the Accessibility Scheme ........................ 13

    The Existing Wheelchair Taxi Fleet Meets Demand ................................... 15

    The Inferiority of Wheelchair Medallions .................................................. 15

    The August 2015 Conversion Orders .......................................................... 18

ARGUMENT ....................................................................................................... 18

    I.   The Mandatory Conversion Rule Denies Independent Medallion
        Owners Equal Protection Of The Law ................................................. 19

    II.  No Taxi Owner-Drivers Were Given Notice Or An Opportunity To
        Be Heard Before The TLC Agreed To A Settlement That Required
        Owners To Convert To An Inferior Class Of Medallion ...................... 22

    III. The TLC's Forced Conversion Program Is Not Necessary To Serve The
        Public Interest And Will Do Irreparable Harm To Plaintiffs ................ 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegheny Pittsburgh Coal Co. v. Webster County*,
  488 U.S. 336 (1989)................................................................................................ 19, 21

*Bell v. Burson*,
  402 U.S. 535 (1971)........................................................................................................ 22

*Boddie v. Connecticut*,
  401 U.S. 371 (1971)........................................................................................................ 23

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
  212 F.3d 738 (2d Cir. 2000)........................................................................................... 24

*Charette v. Town of Oyster Bay*,
  159 F.3d 749 (2d Cir.1998)............................................................................................ 24

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)........................................................................................................ 23

*Colonial Springs Club v. Westchester Cnty.*,
  840 F. Supp. 19 (S.D.N.Y. 1993) ................................................................................... 19

*Engquist v. Oregon Dep't of Agr.*,
  553 U.S. 591 (2008)........................................................................................................ 20

*Hansberry v. Lee*,
  311 U.S. 32 (1940).......................................................................................................... 23

*Hayes v. Missouri*,
  120 U.S. 68 (1887).......................................................................................................... 20

*Illinois Transp. Trade Ass'n v. City of Chicago*,
  No. 14 CV 827, 2015 WL 5610880 (N.D. Ill. Sept. 22, 2015)...................................... 20

*Martin v. Wilks*,
  490 U.S. 755 (1989)........................................................................................................ 23

*Metropolitan Life Ins. Co. v. Ward*,
  470 U.S. 869 (1985)........................................................................................................ 19

*Metropolitan Taxicab Bd. of Trade v. City of New York*,
  615 F.3d 152 (2d Cir. 2010)........................................................................................... 18

*Miller v. Carter,* 547 F.2d 1314 (7th Cir. 1977) ............................................ 20

*Noel v. New York City Taxi & Limousine Comm'n,*
    837 F.Supp.2d 268 (S.D.N.Y.2011) ......................................................... 8

*Noel v. New York City Taxi and Limousine Comm'n,*
    687 F.3d 63, 70 (2012) ........................................................... 1, 4, 8, 9

*Racine Charter One, Inc. v. Racine Unified Sch. Dist.,*
    424 F.3d 677 (7th Cir.2005) ................................................................. 22

*Rathgaber v. Town of Oyster Bay,*
    492 F. Supp. 2d 130 (E.D.N.Y. 2007) ................................................... 24

*Richards v. Jefferson County,*
    517 U.S. 793 (1996) .............................................................................. 23

*Robinson-Pitts v. Bd. of Educ. of City of New York,*
    544 F. Supp. 187 (E.D.N.Y. 1982) ........................................................ 24

*Rothenberg v. Daus,*
    No. 08 Civ. 567, 2010, WL 3860425  (S.D.N.Y. 2010) ........................... 22

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) .................................................................... 24

*Shumway v. United Parcel Serv., Inc.,*
    118 F.3d 60 (2d Cir. 1997) .................................................................... 22

*Sioux City Bridge Co. v. Dakota Cnty., Neb.,*
    260 U.S. 441 (1923) .............................................................................. 19

*Sunday Lake Iron Co. v. Wakefield,*
    247 U.S. 350 (1918) .............................................................................. 19

*Swanson v. City of Chetek,*
    719 F.3d 780 (7th Cir. 2013) ................................................................ 19

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) .................................................................... 24

*United States v. James Daniel Good Real Prop.,*
    510 U.S. 43 (1993) ................................................................................ 23

*Vill. of Willowbrook v. Olech,*
    528 U.S. 562 (2000) .............................................................................. 19

**Statutes**

HAIL Act (Laws of 2012, Ch. 9) § 8 ......................................................................... 8

N.Y.C. Admin. Code  (NYC Code) § 19–502(h) ...................................................... 2

NYC Charter § 2300 .................................................................................................. 3

NYC Charter § 2303(3) .............................................................................................. 4

NYC Code § 19-504(a)(1) ...................................................................................... 2, 4

NYC Code § 19-506 ................................................................................................... 4

NYC Code § 19-512 ................................................................................................... 4

NYC Code § 19-531 ................................................................................................... 5

NYC Code 19-504 ...................................................................................................... 4

NYC Code 19-504(i) .................................................................................................. 2

NYC Code 19-512 ...................................................................................................... 7

**Rules**

ADA Title II(A) ....................................................................................................... 8, 9

ADA Title II(B) .......................................................................................................... 8

TLC Rule 52-04 .......................................................................................................... 7

TLC Rules 55 .............................................................................................................. 4

TLC Rule 58-20 .......................................................................................................... 3

TLC Rule 58-20 (a)(1)(iii) ......................................................................................... 6

TLC Rule 58-20 (a)(2) ............................................................................................... 3

TLC Rule 58-20(b) ..................................................................................................... 3

TLC Rule 58-21(c) ..................................................................................................... 6

TLC Rule 65-03(d) ..................................................................................................... 3

TLC Rule 65-04(b) ..................................................................................................... 5

TLC Rule 65-04(e) ..................................................................................................... 5

TLC Rule 65-14(b) ............................................................................................................... 5

TLC Rule 78 ...................................................................................................................... 14

TLC Rules 58-20(a)(1)(iv)-(v) ............................................................................................ 7

## PRELIMINARY STATEMENT

Plaintiffs Jaswinder Singh, Balbir Nagi and Man Singh are taxi drivers and owners of individual independent taxi medallions in which they invested nearly 20 years ago. They are joined by the NYC Yellow Cab Drivers Association, an advocacy group devoted to protecting the interests of such independent medallion owners. Plaintiffs' medallions have always been unrestricted, meaning they could be attached to any taxicab meeting regulatory standards. But if a recent order by the NYC Taxi and Limousine Commission (TLC) is allowed to take effect, plaintiffs will be forced to purchase and operate more far more expensive and less remunerative wheelchair-accessible vehicles. These vehicles are more costly and less comfortable to operate. They are also much more difficult to lease to other drivers. As a result, plaintiffs' medallions will become less profitable and less marketable than the unrestricted medallions that plaintiffs purchased—if indeed there is any market for them at all.

The TLC's order effectuates the "settlement" of an earlier lawsuit, *Noel v. New York City Taxi and Limousine Comm'n*, a settlement the TLC entered *after* the Second Circuit had ruled in its favor that the TLC and the city had no legal obligation to provide wheelchair accessible taxi service. None of the plaintiffs, and no taxi drivers, were parties to the *Noel* action, and none were afforded notice or opportunity to be heard on the settlement. Imposing a settlement agreement on non-parties not represented in the underlying lawsuit is a plain denial of due process of law.

The TLC's order applies to some yellow taxi owners, but not to others. And it does not apply at all to black cars, another class of for-hire vehicle also regulated by city ordinances and TLC rules. The TLC's separate and unequal treatment of plaintiffs and similarly situated individual medallion owners is a clear denial of equal protection of the law. Requiring plaintiffs to convert to wheelchair-accessible vehicles will cause them irreparable harm by damaging their

1

ability to generate income from the compromised medallions and to profit from their sale.

Defendants are proceeding with their plan even though there is no evidence or reason to believe

that the TLC's plan is in any way necessary to provide adequate taxi service to the city's

wheelchair-using passengers. For these reasons, plaintiffs are entitled to a preliminary injunction

based on their Due Process and Equal Protection claims.

### FACTUAL BACKGROUND
### Plaintiff Taxi Drivers and the Medallion System

A NYC taxi medallion is a license necessary to own and operate a yellow taxicab. NYC

Code § 19-504(a)(1).[1] Medallions and the medallion system were initiated by the Haas Act,

enacted by the city's Board of Aldermen (the predecessor to the City Council) in 1937.

Responding to an oversupply of taxis and the depression of taxi driver incomes, the Haas Act

placed a cap on the number of taxi licenses or "medallions" (so named because they were

accompanied by a metal plate required to be affixed to the outside of the taxi).[2] Though the

number has fluctuated since the act was passed, as of early 2014, the number of yellow

medallions was limited to 13,437. The Haas Act also established that 60% of medallions would

be corporate or "minifleet" medallions and 40% would be "independent" or individually owned.

NYC Code 19-504(i). TLC Factbook at 12, PX 4. This medallion system exists to this day and

has been widely copied by other U.S. cities. Schaller Factbook (PX 5) at 22, 38.

Today, the city's taxi industry—including its owners, drivers, agents and brokers—is

regulated by the City Council and by the TLC, an agency established in 1971. The TLC's

jurisdiction is defined by the City Charter, which charges the agency with regulating taxi and

---

[1] Copies of NYC Code sections and TLC rules cited herein are collected in Exhibit A to the Ackman declaration.

[2] Schaller, *The New York City Taxicab Fact Book*, PX5, available at http://www.schallerconsult.com/taxi/taxifb.pdf

[2] Schaller, *The New York City Taxicab Fact Book*, PX5, available at http://www.schallerconsult.com/taxi/taxifb.pdf
  (Schaller Factbook); G.R.G. Hodges, *Taxi! A Social History of the New York City Cabdriver*, pp. 66-67 (Johns
  Hopkins University Press 2007); N.Y.C. Admin. Code  (NYC Code) § 19–502(h) (defining "medallion").

limousine service as part of establishing an overall public transportation policy governing taxi, coach, limousine, wheelchair-accessible vans and commuter vans. NYC Charter § 2300.

Plaintiffs each obtained taxi driver licenses and started driving yellow (medallion) taxis between 1988 and 1990. After years of leasing medallions and taxis from others, each of them invested in a medallion of his own. Jaswinder Singh and Nagi bought their medallions in 1996, and Man Singh bought his in 1997. PX 1-3 (plaintiffs' declarations).[3] Like more than 90% of NYC yellow taxi drivers, plaintiffs are first-generation immigrants to the United States[4], though all are now citizens. PX 1-3, ¶s 2.

Each plaintiff owns an independent medallion. In contrast to corporate medallions, which may be owned by passive investors and operated by fleets, only a licensed taxi driver may purchase and hold an independent medallion. Crucially, a driver may own one, and only one, independent medallion. TLC Rule 65-03(d). The owner-driver of an independent medallion is legally obligated to operate his taxi a minimum number of shifts per year as determined by the TLC's "owner-must-drive" rule. TLC Rule 58-20. But when he is not driving, the owner may lease his medallion (and taxi) to another driver, sometimes called a second-shift driver. *See* TLC Rule 58-20(b).[5] As discussed below, most independent medallion owners do lease their medallions. This ability is fundamental to independent medallion ownership. By contrast, owners of corporate medallions have no duty to drive, may own any number of medallions, and simply lease them to licensed cabdrivers, including via a fleet operation or a licensed taxi agent.

---

[3] All plaintiffs' exhibits marked PX __ are to the declaration of Daniel L. Ackman dated Oct. 29, 2015. Declarations filed as exhibits to the Ackman declaration, are cited by the declarant's name and paragraph number.

[4] *2014 Taxicab Fact Book* 9, published by the NYC TLC and available at http://www.nyc.gov/html/tlc/downloads/pdf/2014_taxicab_fact_book.pdf (TLC Factbook), PX 4.

[5] The owner-must-drive rule, recently amended, allows an owner to take advantage of the "independent driver option" and avoid the driving requirement if he meets certain conditions and pays a penalty. TLC Rule 58-20 (a)(2).

While the City Council and various city agencies have long regulated the for-hire vehicle industry, the city's taxicabs have always been privately owned and operated. *Noel v. New York City Taxi and Limousine Comm'n*, 687 F.3d 63, 70 (2012) ("At the risk of being obvious, the New York City taxicab industry is a private industry.") (internal quotation omitted). Individuals and private companies—and not the city or the TLC—own taxis, maintain and operate taxis. These individuals or corporations may buy and sell their medallions, the sales being regulated and monitored by the TLC. NYC Charter § 2303(3) (medallions "remain valid in accordance with their terms and [are] transferable according to law"); NYC Code § 19-512 ("Any taxicab license … shall be transferable…."). The market price for those medallions has climbed steadily over the years. Thus, by 2013, according to the TLC, the average sale price of an independent medallion was approximately $967,000, and the average sale price of a corporate medallion was approximately $1,150,000. TLC Factbook 12.

### Non-Medallion Taxis

Since the mid-1980s, the city and the TLC have also been licensing and regulating non-medallion for-hire vehicles known as livery cabs and black cars. Schaller Factbook 24; Husock, "New York's Unsung Taxi Triumph," The City Journal, Autumn 1999 (describing "New York's two-tier taxi system"). Livery cabs (also known as car services or community cars) operate mostly outside Manhattan's central business district and provide for-hire service by pre-arrangement. Black cars have traditionally served corporate clients such as banks or large accounting firms, setting fares by contract with those clients. TLC Factbook 2. Liveries and black cars are not permitted to accept passengers via street hail. NYC Code 19-504(a)(1). Though FHVs are not required to have medallions, the vehicles and their drivers are also subject to local ordinances and TLC rules. NYC Code 19-504, 19-506; TLC Rules Chaps. 55 & 59.

As of early 2014, there were "about 10,000" black cars in service, a number that had held fairly steady at least since 2005. TLC Factbook 2; Schaller Factbook 26. Since then, as discussed below, the number of black cars has exploded with the arrival of new taxi services using smart-phone apps such as Uber Technologies, Inc. ("Uber").

### The Advent of Restricted Medallions

The NYC Code and TLC Rules require that newly issued medallions be sold at public auction. NYC Code § 19-531; TLC Rule 65-14(b). In 2004, the city introduced two new classes of "restricted" medallions, specifically wheelchair-accessible medallions and alternative fuel (or hybrid) medallions. As their names indicate, these medallions must be attached to a wheelchair-accessible vehicle or to an alternative-fuel vehicle. They were introduced to the market through auctions held between 2004 and 2007. TLC website listing Auction Results, PX 6. In this same period, the TLC also auctioned unrestricted medallions (both independent and corporate). The restricted medallions fetched substantially lower prices than unrestricted medallions. Schaller Factbook 2, 28.

The auction rules permit the TLC to conduct separate auctions for each discrete "classification" of medallion: Independent Medallions, Minifleet Medallions, Accessible Independent Medallions, Accessible Minifleet Medallions, Alternative Fuel Independent Medallions, and Alternative Fuel Minifleet Medallions. TLC Rule 65-04(e). In practice, the TLC has always auctioned each medallion class at separate sales. PX 6. TLC rules also require that "Each Medallion will belong to only one classification[] and will permanently remain in that classification regardless of change in ownership of the Medallion after issuance." TLC Rule 65-04(b). In other words, a restricted medallion may not be re-designated as an unrestricted medallion, and vice versa.

**The Economics of Independent Medallion Ownership**

As the TLC notes on its website, a medallion is "also a license to own and operate a small business and can be leased to other operators for a fee." PX 7. Because independent taxi medallions have sold for more than $1 million, and because the sale price has exceeded $200,000 since the mid 1990s, the vast majority of independent medallion owners, and each of the individual plaintiffs, financed their purchases. Schaller Factbook 38-39; TLC Factbook 12; PX 1-3 (plaintiffs' declarations). Indeed, several financial institutions such as Medallion Financial and Melrose Credit Union devote a substantial share of their billion-dollar-plus loan portfolios to medallion financing. PX 8, 9.[6] Independent medallion owners typically refinance their medallions from time to time, and plaintiffs here have done so. PX 1-3. Between finance and re-finance obligations, the debt service on medallion is generally substantial. Beyond debt service, owners must pay vehicle costs, "hack-up" costs (that is, converting a car into a taxicab), insurance and TLC-licensing fees.

To meet these substantial costs, an independent medallion owner earns income from driving his taxi, that is, from passenger fares. But during shifts when he is not driving himself, the medallion owner may lease his medallion to another licensed cabdriver.[7] Most owner-drivers, in fact, do so. TLC Factbook 12; Schaller Factbook 25. TLC Rules permit an owner to lease a taxi and medallion to a second-shift driver for up to a regulatory lease cap of $737 per week (or $755 per week if the taxicab is a hybrid vehicle). TLC Rule 58-21(c). This ability to lease as well as drive has long been critical to the economics of independent medallion ownership. *See* PX 7;

---

[6] These institutions are severely troubled by delinquencies and troubled debts in their taxi-medallion portfolios. Elstein, "Credit unions face bloodbath from medallion owners smothered by Uber," Crains New York Business, Sept. 8, 2015, PX 8.

[7] Owners of independent medallions purchased after 1990 must drive their taxicabs a minimum number of hours per year. The current "owner-must-drive" minimum requirement, which was recently reduced, is generally 900 hours annually, though there are exceptions, including for drivers older than 62, when the owner-must-drive requirement is reduced to 600 hours. TLC Rule 58-20 (a)(1)(iii).

Pang, "One Taxi Driver's Fight to Save His Medallion and His Family's Future," Epoch Times, Oct. 15, 2015, PX 10. This economic imperative is well-known to the TLC, which is charged with setting the rate-of-fare for passengers and the caps on lease rates medallion owners may charge to non-owner drivers. *See* TLC Rule 52-04 (establishing TLC's duties and responsibilities with respect to setting rates and lease caps).

Ultimately, an owner may sell his medallion to another licensed taxi driver. NYC Code 19-512. On his death, he may bequeath it to his surviving spouse. But unless his spouse is also a licensed taxi driver, she may hold it for only six months, at which point she must meet the owner-must-drive requirements herself or sell it. TLC Rules 58-20(a)(1)(iv)-(v). The forced conversion to a wheelchair medallion, as discussed below, negatively impacts both the sale value and the lease value of an independent medallion. It also reduces the direct value from driving by making a taxi driver's job, already hard, even harder.

### The Noel Litigation and the Second Circuit Ruling

In 2011, two individuals and several advocacy groups sued the TLC and its chair alleging violations of the Americans with Disabilities Act (ADA). The case, filed in the Southern District of New York, was initially captioned *Noel v. New York City Taxi and Limousine Commission Limousine Comm'n*, No. 11 Civ. 237 (GBD) before it was re-captioned *Taxis for All Campaign v. New York City Taxi and Limousine Comm'n* in 2013. The *Noel* action focused solely on yellow (medallion) taxis and noted that just 231 of the 12,237 yellow taxis at that time were wheelchair-accessible. It should be noted that there are now 631 wheelchair-accessible medallions. PX 35. No medallion owner, no taxi driver, and no owner of a for-hire vehicle was named as a defendant in the *Noel* action.

At first, the TLC offered a vigorous defense. In doing so, the TLC noted that just days before the district court ruled on cross motions for summary judgment, the state legislature had

passed legislation known as the HAIL Act that created a new class of livery vehicles— called

green taxis—which would be permitted to respond to street hails in northern Manhattan and in

the outer boroughs and which would substantially increase the number of wheelchair-accessible

taxis. The HAIL act authorized the City to issue 18,000 green taxi licenses over a three-year

period. Of that total, 20% would be for accessible vehicles. The HAIL Act also permitted the city

to issue 2,000 additional yellow taxi medallions, all of which were required to be wheelchair

medallions. *See Noel*, 687 F.3d at 66 n.2; HAIL Act (Laws of 2012, Ch. 9) § 8.

      After discovery, the plaintiffs moved for partial summary judgment on their ADA claims.

The defendants cross-moved for summary judgment as to the entire complaint. Each side's

motion was granted in part and denied in part. As to Title II(B) of the ADA, which governs

public transportation, the district court granted summary judgment in favor of the TLC. The

district court concluded that, even with TLC's extensive regulatory powers, the agency had "no

authority to provide [public transportation] services and does not function as a transportation

services provider to the public." *Noel v. New York City Taxi & Limousine Comm'n*, 837

F.Supp.2d 268, 274 (S.D.N.Y.2011). For that reason, the TLC was not obligated to ensure

meaningful access to taxis for persons with disabilities. *Id*. at 274-75. As to Title II(A), however,

which governs public services generally, the district court granted summary judgment for the

plaintiffs on the ground that the city afforded the disabled no meaningful access to taxi service.

The district court then issued a temporary injunction requiring the TLC to develop a plan to

provide meaningful access to taxicab service for wheelchair-using passengers. *Id*. at 278.

      The TLC appealed and won. In a decision dated June 28, 2012, the Second Circuit

vacated the injunction and ordered the district court to enter summary judgment for defendants.

Specifically, the Court of Appeals held: "Notwithstanding [the Second Circuit's own] broad

construction of the ADA, [the Act] does not support plaintiffs' claim against the TLC." Because NYC taxis were operated by private industry, Title II(A), which bars discrimination by state actors, did not apply. The Court of Appeals concluded that the ADA expressly exempts taxi providers from being required to purchase or lease accessible automobiles. This exemption, the Court of Appeals held, "compels the conclusion that the ADA, as a whole, does not require the New York City taxi industry to provide accessible taxis." *Noel*, 687 F.3d at 74. "In sum," the Court added, "Title II(A) does not obligate the TLC to use its licensing and regulatory authority over the New York City taxi industry to require that taxi owners provide meaningful access to taxis for persons with disabilities." *Id.* Accordingly, the Court "vacate[d] the temporary injunction and remand[ed] for the district court to enter summary judgment for defendants on the Title II(A) claim and for further proceedings consistent with [its] opinion." 687 F.3d at 65.

### The Noel Settlement Scheme

Despite, this emphatic ruling, following an amended complaint and another so-called summary judgment motion, which was on a narrow issue and was never decided,[8] in December 2013, the TLC suddenly agreed to a settlement that awarded the plaintiffs substantial relief. First announced by letter to the district court dated December 6, 2013, the settlement provided that within 30 days of a memorandum of understanding between the parties, the TLC would commence rulemaking that would require taxicab medallion owners to utilize accessible taxicab vehicles on a phased-in schedule until at least 50% of the medallion taxi fleet had become wheelchair accessible. PX 11, 12. It provided that the conversion period for medallion taxis to become accessible would be the date on which a commercially available accessible vehicle met NYC Code requirements or by January 1, 2016 (which became the operative conversion date).

---

[8]  The plaintiffs' post-remand motion focused solely on whether "Taxi of Tomorrow," a vehicle that the TLC had mandated for use with all medallions was a "van" as opposed to being a "sedan-type vehicle." PX 23.

The agreement was signed by lawyers for the TLC and the city and by a lawyer for all plaintiffs, but not, of course, by not by any lawyer for medallion owners or taxi drivers.

Nothing in the settlement demonstrated any *need* for fully half of the city's taxis to be wheelchair accessible. Indeed, the Second Circuit noted that wheelchair users make up less than one percent of New York City's population. Meanwhile the city already maintained several programs for providing wheelchair-accessible service. These programs included Access-A-Ride (a joint program of the TLC and the MTA), a wheelchair-accessible yellow taxi service that operates in Manhattan, a wheelchair-accessible for-hire-vehicle service that operates in the Bronx, Brooklyn, northern Manhattan, Queens, and Staten Island, and a rule that requires livery bases to provide service to wheelchair passengers. PX 13, 14; TLC Rule 59B-17. Indeed, in defending the *Noel* action, then TLC Deputy Chairman Chhabra detailed these and other "numerous" ways that taxis were already available to handicapped individuals. Decl. of TLC Dep. Comm. Ashwini Chhabra ¶¶ 7-21, PX 15.

On June 6, 2014, the *Noel* plaintiffs filed a formal settlement agreement and a proposed notice that would go to "All persons using wheelchairs or scooters who reside in or visit New York City who are persons with disabilities under the Americans with Disabilities Act, Rehabilitation Act, and/or City Human Rights Law and who seek to use New York City medallion taxis, as well as any interested third parties." On June 10, 2014, the district court issued an order "preliminarily approv[ing]" the *Noel* settlement and finding "on a preliminary basis that the Settlement Stipulation is fair, adequate, and reasonable to all potential class members, as well as industry third-parties." PX 16.

Despite the mention of "industry third-parties," and despite the fact that the settlement was sent to a long list of advocacy groups and their members (by listserv), neither taxi drivers

nor taxi owners were afforded notice of either the preliminary or final settlement. PX 17 (listing the parties to whom notice was sent); PX 16, ¶ 7 (order requiring notice). One group representing taxi fleet owners and one medallion owner (the Metropolitan Taxi Board of Trade (MTBOT) and Colonial Cab Corp.) did, however, move to intervene as defendants in the *Noel* case. But the district court denied the MTBOT motion by a one-line order dated February 28, 2014. PX 18. Two other fleet owner groups, the Greater New York Taxi Association and the Committee for Taxi Safety, filed objections. But the district court order dated September 16, 2014, found them "meritless" without further comment, while, at the same time questioning whether these "non-parties" had "standing to object to a class action settlement." PX 19, ¶ 7.[9]

In keeping with the settlement, on March 25, 2014, the TLC published a proposed amendment to its rules, adding new Rule 58-50, which was adopted by a vote of the TLC commissioners on April 30, 2014. It requires owners of unrestricted corporate medallions to employ a wheelchair-accessible vehicle on 50% of their medallions when their current vehicle is retired and a new one is placed into service. It also requires half of the owners of an independent medallion to convert to a wheelchair-accessible vehicle when he places a new vehicle into service. The independent owners who would be subject to this conversion requirement, as distinguished from those who would not, would be selected by a "biannual lottery." The new rule applies retroactively to the individual plaintiffs, who, of course, purchased unrestricted medallions years before the settlement was agreed to and put into effect.

On September 16, 2014, the district court issued an order, again stating that the settlement was "fair, adequate, and reasonable to all known and potential class members, *as well as all relevant industry third-parties*." PX 22, ¶ 1 (emphasis added). As with the preliminary

---

[9] Just one month earlier, Ashwini Chhabra, the TLC's deputy commissioner for policy announced he was joining Uber, PX 20. A few months after the settlement, TLC Chair David Yassky became a consultant for Lyft. PX 21.

order, neither taxi owners nor taxi drivers were given notice. PX 17. But, pursuant to the

settlement, randomly selected independent medallion owners—who, by law, may own just one

medallion— will be required to purchase, maintain and operate a wheelchair-accessible vehicle.

Drivers *not* selected by lottery will have no new obligation. Owners of black cars will also have

*no obligation* to purchase or operate wheelchair vehicles. In short, the settlement created four

separate and unequal classes of taxi owner:

> **GROUP 1**: INDEPENDENT MEDALLIONS OWNERS SELECTED BY
> LOTTERY are **required to operate a wheelchair-accessible vehicle**
> attached to their only medallion, which had been unrestricted.
>
> **GROUP 2**: INDEPENDENT MEDALLIONS OWNERS <u>NOT</u>
> SELECTED by lottery would have **no obligation** to operate a wheelchair-
> accessible vehicle.
>
> **GROUP 3**: CORPORATE MEDALLION OWNERS would be required to
> operate a wheelchair-accessible vehicle **as to half of their medallions**.
>
> **GROUP 4**: BLACK CAR OWNERS, including those hailed directly by
> smart-phone apps, **would have no obligation** to operate a wheelchair-
> accessible vehicle.

Though the settlement was between the TLC and the *Noel* plaintiffs, substantially all of the costs

of purchasing, maintaining and operating wheelchair-accessible vehicles are to be imposed on

private individuals and corporations who own taxis and medallions (perhaps with a subsidy from

taxi passengers, as discussed below).

**The Taxicab Improvement Fund**

In an apparent effort to reduce the impact of those costs, when the TLC proposed new

Rule 58-50, the "Statement of Basis and Purpose" that accompanied the proposal also announced

a plan (though not as part of the rule) for a "Taxicab Improvement Fund" to be financed by a

surcharge of 30 cents per trip on yellow taxi fares. The statement indicated that 5 cents per trip

would be reserved for drivers to help defray costs associated with providing accessible service

and the remaining 25 cents would go to owners to compensate them for the costs of purchasing

and maintaining wheelchair-accessible vehicles. It was "anticipated" that $14,000 would go toward vehicle purchases and another $16,000 would compensate for additional operational maintenance costs and revenue lost due to the taxicab being off the road for repairs. PX 24. While a rule requiring these payments to owners and drivers has since been proposed, it has not yet been voted on by the TLC and the mechanism for any such payments is not in place.

### The Rise of E-hail Taxis and their Exclusion from the Accessibility Scheme

Since December 2013 when the TLC settled with the *Noel* plaintiffs, the city's taxi industry has undergone a dramatic change spurred by the arrival of a new type of taxi hailed by smart-phone apps. These taxis are affiliated with venture capital-backed companies of international scope, most prominently Uber, a California corporation with operations around the world and a reported market capitalization of $50 billion.[10] While Uber and other app-based companies dispatch black cars, not yellow taxis, Uber cabs are not dispatched from bases. Instead, they operate like yellow taxis, cruising the streets while waiting for "e-hails."  Like yellow cabs, Uber cabs meet the immediate demands of passengers, boasting wait times of just two or three minutes.[11]

Though the TLC stated in early 2014 that black cars "[p]rovide service mostly for corporate clients, setting fares by contracts with clients," and that there were "about 10,000" such vehicles, this is no longer the case. As of October 3, the TLC website indicates there are 34,593 licensed black cars in the city. The increase is entirely due to the influx of e-hail taxis. Now, the black cart fleet is more than two-and-a-half times the size of the yellow taxi fleet. Indeed, there are more than 23,000 black cars affiliated with Uber alone, making the total

---

[10] *See*, *e.g.*, "Uber Valued at More Than $50 Billion," The Wall Street Journal, July 31, 2015, PX 25; "Uber is officially a $50 billion company," Business Insider, Jul. 31, 2015, PX 26.

[11] "Uber just threw down the gauntlet to New York City's mayor," Business Insider, July 20, 2015 (reporting wait times in Manhattan of 2 minutes and 25 seconds and 3 minutes and 8 seconds in other boroughs), PX 27.

number of Uber cabs nearly double the number of yellow cabs. Goldwyn ¶¶ 3-5, PX 28. Not limited to corporate accounts, e-hail taxis are available to any passenger who has downloaded the app provided free of charge by Uber, Lyft, Gett or any of several other taxi-app companies. *See generally* TLC Rule Chapter 78 ("Licensing & Rules for Providers of E-Hail Applications"). Indeed, Uber advertises its service to all comers with the slogan, "Your ride on-demand," promises "transportation in minutes," and claims an average wait-time of about three minutes. PX 29, 30. Lyft likewise promises a "ride in minutes" to anyone with the app. PX 31. Uber alone claims to have served 2.5 million customers in New York, so it reaches far beyond the corporate clients of traditional black car services. PX 30.

With this new e-hail taxi competition for both passengers and drivers, medallion values have declined.[12] For most passengers, app-based taxi services have increased the availability of taxis. They have not increased the number of taxis for wheelchair users, however. Despite their dramatic rise, none of these e-hail giants offers wheelchair-accessible service from their affiliated vehicles. This is because the TLC has not required any black car owners to provide it. Lapowsky, "Uber's Business Isn't Built to Help Disabled People," Wired, Aug. 14, 2015, PX 32. Thus, roughly zero of the nearly 23,000 black cars affiliated with Uber bases are required to be wheelchair accessible.[13]

At a recent TLC public meeting, TLC Chair Meera Joshi summarized the disparate impact of TLC rules nicely. Responding to a comment from the floor, Joshi said:

> [The] same standard does not apply [to non-medallion taxis].…many large sections of the FHV [segment of the market] don't even have an accessibility requirement of any type at all.… *[W]e're looking at one segment and demanding much, much, more from one small segment* and

---

[12] *See, e.g.*, Tangel, "New York City's Yellow Taxis Face Trouble," The Wall Street Journal, July 23, 2015, PX 33.

[13] Uber's app allows customers the option of hailing yellow taxis, including wheelchair-accessible taxis. But the black cars that Uber dispatches and which are affiliated with Uber bases are not wheelchair accessible.

14

there's lots of segments out there that don't have a similar requirement. PX 34 (emphasis added).

## The Existing Wheelchair Taxi Fleet Meets Demand

There are, by the TLC's account, currently 631 already-issued wheelchair yellow medallions as well as 1,925 already-issued green taxi licenses. TLC Press Release dated Mar. 26, 2014, PX 35; Goldwyn ¶ 6. The TLC already maintains a subsidized citywide Accessible Dispatch Program that provides over 47,000 medallion taxi rides annually. Passengers may hail an accessible taxi via the city's 311 phone number, by text message, via a website or by smart-phone. Wait-times have dropped precipitously. TLC Accessible Dispatch Program Report, PX 36. While the number of riders using that program is growing, the TLC has never suggested that the current wheelchair-accessible fleet is in any way inadequate to meet demand. Certainly, the TLC has never attempted to explain why the city needs fully half of all yellow taxis to be wheelchair accessible or why the already-authorized 1,600 additional wheelchair-accessible medallions is not more than enough.

## The Inferiority of Wheelchair Medallions

While Uber and other e-hail taxis have impacted the entire industry, the pressure on wheelchair-accessible medallion owners has been especially acute. Wheelchair-accessible vehicles are less fuel-efficient, especially when compared to increasingly prevalent hybrid cabs. The ramps—which are not installed by the car manufacturer but by after-market retrofitters—tend to rattle and shake. The persistent clatter makes the vehicles very uncomfortable to drive, especially over the course of a 12-hour shift. This factor is important for drivers considering leasing the medallion; and it is important to the owner-driver, who may spend 70 hours per week behind the wheel. PX 1-3. The vehicles tend to break down more often and are more expensive to maintain. Though the number of actual hails by wheelchair users tends to be small, older or

less physically fit drivers may have difficulty pushing a wheelchair up a ramp. For these reasons, wheelchair-accessible vehicles are far less desirable to non-owner drivers contemplating leasing a taxi (that is a taxicab plus a medallion). Indeed, often there are no drivers willing to lease wheelchair-accessible vehicles.  Messados ¶¶ 4-7, PX 37; Nadelman ¶¶ 4-6, PX 38.

Some medallion leasing agents (that is, companies in the business of leasing medallions from owners and leasing them in turn to drivers) offer wheelchair medallions at deep discounts to drivers in an effort to avoid a total loss. But often they no longer even attempt to lease them. Messados ¶¶ 4-7, PX 37; Nadelman ¶¶ 4-5, PX 38; Ouzlian ¶¶ 5-9, PX 39. Leasing agents have even put wheelchair medallions into "storage," taking them off the road to avoid insurance and other expenses. Messados ¶¶ 6-7, PX 37; Nadelman ¶¶ 4-5, PX 38.

For example, Queens Medallions Leasing Inc. (QML) is one of the industry's largest leasing agents. It manages 542 medallions of which, until recently, 42 were wheelchair-accessible. In order to lease these medallions at all, QML dropped its weekly lease rate to drivers from $1,400 to $900. Still, there are few takers. Nearly all drivers prefer to lease hybrid taxis. Most of the time, the wheelchair vehicles sit idle. QML has returned six wheelchair medallions to their owners because it cannot find drivers for them. And it has placed 18 of the remaining 36 in storage. By comparison, of the 500 non-wheelchair medallions it manages, it has placed just two in storage. Messados ¶ 6, PX 37. Maintenance problems and the difficulty finding second shift drivers affect individual medallion owners in the same way, even those who have purchased the accessible version of the so-called Taxi of Tomorrow. Mohabatal Singh ¶¶ 3-12, PX 40.

Some independent medallion owners who lease their medallions to taxis agents have been preemptively "fired" by their agents after being selected by lottery and forced to convert to a wheelchair-accessible vehicle. For example, the leasing agent employed by independent

16

medallion owner Amiak Ouzlian first reduced its payments, saying "[D]rivers do not want to drive the accessible vehicles." Soon after, it terminated the lease altogether because there was no other viable option. Ouzlian ¶¶ 5-8, PX 39.

Owners of wheelchair-accessible green taxis are also rapidly withdrawing them from service. As of the end September 2015, the TLC had issued 8,113 green taxi licenses, of which 1,925 (24%) are wheelchair-accessible. Eight-hundred-and-ninety-nine (899) of these 1925 green wheelchair licenses, or 47%, are listed as "inactive," that is they have been withdrawn from service. By contrast, just 16% of non-wheelchair green taxis are inactive. In other words, owners of wheelchair-accessible green taxis are three times more likely to have given up the use of their vehicles than owners of non-wheelchair green taxis. Goldwyn ¶ 6, PX 28.

Beyond the dying lease market, wheelchair-accessible medallions are essentially unsalable. Sapino ¶¶ 1-3, PX 41; Messados ¶ 8, PX 37. Indeed, since the 2013-2014 auctions, only one wheelchair-accessible medallion has been sold, and that was in a foreclosure. Goldwyn ¶ 7, PX 28. This is largely because, as one taxi medallion broker puts it, "Few, if any buyers, are interested in purchasing a medallion that he or she cannot lease." Sapino ¶ 3, PX 41. And for owner-drivers, who work up to twelve-hour shifts, these vehicles—though dispatched to wheelchair users perhaps once a day—are uncomfortable and prone to breakdowns.

The TLC is well aware of the market's collapse. As noted, the HAIL Act authorized the city and the TLC to sell 2,000 medallions, all of them are required to be wheelchair-accessible. TLC Appeal Br. in Noel at 30-32, PX 42. While the city did sell 400, it has postponed plans for future sales that had been expected to raise more than a billion dollars. *Id*.; NYC Comptroller Comments on City's Fiscal Year 2016 Executive Budget, PX 43; *see also* Hawkins, "City Council scraps taxi-medallion cash from city budget," Crain's New York Business, April 16,

2015, PX 44. In short, the TLC and the taxi industry have both concluded that there is no viable market for wheelchair medallions.

**The August 2015 Conversion Orders**

Nevertheless, and despite this precarious market, by letters dated August 17, 2015, TLC Chair Joshi ordered plaintiffs Singh, Balbi and Singh to convert to wheelchair-accessible taxicabs. PX 45. The orders mention the possibility of "financial assistance" toward buying and maintaining the vehicle, but contain no specific amounts or instruction on how the assistance might be obtained. And they offer nothing to compensate these long-serving taxi drivers for their near-certain losses of lease income and equity in their most significant asset.

**ARGUMENT**

To be entitled to a preliminary injunction, a movant must demonstrate: 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the movants' favor, and 3) that the public interest weighs in favor of granting an injunction. When the moving party seeks a preliminary injunction that will affect government action pursuant to a regulatory scheme, a court should grant it only if the moving party meets the more rigorous likelihood-of-success standard. *See e.g.*, *Metropolitan Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). In this case, plaintiffs are likely to succeed on their Equal Protection and Due Process claims. They also face irreparable harm from being mandated to attach wheelchair vehicles to their unrestricted medallions. Neither defendants nor wheelchair users, on the other hand, will suffer any real harm if the conversions are delayed while Court considers the merits of the complaint.

18

I.      THE MANDATORY CONVERSION RULE DENIES
        INDEPENDENT MEDALLION OWNERS EQUAL
        PROTECTION OF THE LAW

The Equal Protection Clause of the Fourteenth Amendment protects individuals from

governmental discrimination. The typical equal protection case involves discrimination by race,

national origin or sex. But the principle also prohibits the singling out of a person for different

treatment for no rational reason. Where the state has "intentionally treated [a plaintiff] differently

from others similarly situated and [where] there is no rational basis for the difference in

treatment" there has been a denial of equal protection of the law. *Vill. of Willowbrook v. Olech,*

528 U.S. 562, 564 (2000); *see also Swanson v. City of Chetek*, 719 F.3d 780, 783-84 (7th Cir.

2013), *reh'g and suggestion for reh'g en banc denied* (2013).

As the Supreme Court has stated, "[T]he purpose of the Equal Protection Clause of the

Fourteenth Amendment is to secure every person within the State's jurisdiction against

intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by

its improper execution through duly constituted agents." *Vill. of Willowbrook*, 528 U.S. at 564

*(*quoting *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 352 (1918) and *Sioux City Bridge*

*Co. v. Dakota Cnty., Neb.*, 260 U.S. 441, 445 (1923) (internal quotation marks omitted)). While

disparate treatment based on suspect classifications such as race or gender might invoke

heightened scrutiny, the Equal Protection Clause is no less violated "where harmful disparities in

state treatment have no legitimate basis." *Colonial Springs Club v. Westchester Cnty.*, 840 F.

Supp. 19, 21 (S.D.N.Y. 1993) (citing *Allegheny Pittsburgh Coal Co. v. Webster County*, 488

U.S. 336 (1989), and *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1985)). Thus, the

Supreme Court "explained long ago [that] the Fourteenth Amendment 'requires that all persons

subjected to ... legislation shall be treated alike, under like circumstances and conditions, both in

19

the privileges conferred and in the liabilities imposed.'" *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602 (2008) (quoting *Hayes v. Missouri*, 120 U.S. 68, 71–72 (1887)).

This fundamental principle has been applied in the context of taxi regulation, including quite recently. In *Miller v. Carter*, for example, the Seventh Circuit invalidated a city ordinance that permanently barred persons convicted of certain offenses from obtaining a public chauffeur's license even though current licensees would not be automatically disqualified for committing the same offense. 547 F.2d 1314 (7th Cir. 1977), *aff'd*, 434 U.S. 356 (1978). The court held that the ordinance drew a distinction that was "irrational, regardless of the importance of the public safety considerations underlying the statute or the relevance of prior convictions to fitness." *Id*. at 1316. For purposes of taxi regulation, applicants and license holders were "similarly situated," so there was "no justification … for automatically disqualifying one and not the other." *Id.*

Even more on point, just weeks ago, a federal district court held that taxi and livery owners and drivers in Chicago were denied equal protection in comparison with drivers working for "Transportation Network Providers" (TNPs, e.g., Uber cabs) all of whom were competing in the for-hire transportation industry. There was no dispute that the app-based cabs and traditional taxis were "regulated … differently," with a heavier burden on taxis in terms of "background checks, drug tests, vehicle age, maintenance and inspection, insurance, [and other areas]." The court held that this disparate treatment was a constitutional violation. *Illinois Transp. Trade Ass'n v. City of Chicago*, No. 14 CV 827, 2015 WL 5610880, at *4-5 (N.D. Ill. Sept. 22, 2015). It concluded, "[N]one of the supposed differences [between taxi and TNCs] are rationally related to the differences in treatment under the [Chicago ordinance]." *Id*.

In this case, the discrimination against plaintiffs compared to those similarly situated is not a by-product. It is the deliberate design of the policy itself. And it could not be more arbitrary. As TLC Chair Meera Joshi has publicly admitted, the *Noel* settlement plan applies to "one segment [of the taxi industry]" and not others. The TLC is demanding, as Joshi admits, "much, much, more from one small segment and there's lots of segments out there that don't have a similar requirement." PX 34.

It may well be that the city has the power—though the ADA does not require it—to impose an obligation on taxi drivers to offer service to passengers in wheelchairs. But the city and the TLC must impose regulatory burdens even-handedly. Doing otherwise violates the Equal Protection Clause, which "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Allegheny Pittsburgh Coal,* 488 U.S. at 345. As the *Allegheny Pittsburgh* court said*,* "Fairness of one's allocable share" of a regulatory obligation "can only be meaningfully evaluated by comparison with the share of others similarly situated." *Id*. at 346.

In this case, the denial of equal protection to plaintiffs and to the plaintiff class is evident "in comparison" with at least three other groups. Selected individual medallion owners selected literally by lottery will be forced to convert their one and only medallion for wheelchair use. Corporate medallion owners, by contrast, will be required to convert just one out of two. Independent medallion owners not selected by lottery have no obligation to convert. Black car owners providing the same service as yellow cab owners are likewise favored by comparison because none of them face any conversion mandate whatsoever.

There are, to be sure, some distinctions between black cars, corporate medallions and individual medallions. But in terms of their ability to transport passengers in wheelchairs there is

no meaningful difference. For purposes of the Equal Protection Clause, to be "similarly situated," individuals must be similarly situated not in every particular but "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); *see also Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005). Each class of for-hire vehicle provides transportation. Each may be hailed or e-hailed. Each provides the same service to the same customers. Thus, as in *Illinois Transp.*, none of the superficial differences between independent medallion taxis, corporate medallion taxis and Uber taxis are "rationally related to their differences in treatment" mandated and permitted by the *Noel* settlement. 2015 WL 5610880, at *5. That being the case, the far heavier regulatory burden imposed on plaintiffs is "utterly arbitrary" and is, therefore, a denial of equal protection. *Id*.

## II.   NO TAXI OWNER-DRIVERS WERE GIVEN NOTICE OR AN OPPORTUNITY TO BE HEARD BEFORE THE TLC AGREED TO A SETTLEMENT THAT REQUIRED OWNERS TO CONVERT TO AN INFERIOR CLASS OF MEDALLION

A taxi medallion, which can be bought and sold, used to generate income and pledged as collateral, is a form of property. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that a driver's license is property for purposes of the Due Process Clause); *Nnebe*, 644 F.3d at 158 ("undisputed" that "a taxi driver has a protected property interest in his license"). Indeed, the TLC conceded in *Nnebe* and again in a later action that there was no dispute "that a taxi driver has a protected property interest in his license sufficient to trigger due process protection." *Rothenberg v. Daus*, No. 08 Civ. 567, 2010, WL 3860425 at *4  (S.D.N.Y. 2010). What is true of a taxi *driver's* license, which cannot be sold or transferred, is even more evidently so for a taxi *owner's* license (a medallion), which have been bought and sold in this city for decades.

The Due Process Clause of the Fourteenth Amendment provides: "No state shall ... deprive any person of ... property without due process of law." The "general rule" derived from

the Clause is "that individuals must receive notice and opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 48 (1993). This opportunity to be heard is indeed "'the root requirement' of the Due Process Clause." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). This principle, of course, has been "settled for some time." *Loudermill*, 470 U.S. at 542.

Nevertheless—despite having prevailed in the Court of Appeals—the TLC entered into a binding agreement abrogating the rights of taxi owners, especially independent medallion owners, without affording them any notice or opportunity to be heard. For when the TLC settled with the *Noel* plaintiffs the costs of that settlement were to be borne, not by the city or the TLC, but by private taxi owners. And the most substantial costs are to be shouldered by plaintiffs and members of the putative plaintiff class. As demonstrated above, these costs are significant, even debilitating, for owners of a single taxi medallion.

The Supreme Court has explained, "[I]t would violate the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented." *Richards v. Jefferson County*, 517 U.S. 793, 794 (1996) (citing *Hansberry v. Lee*, 311 U.S. 32, 37 (1940)); *see also Martin v. Wilks*, 490 U.S. 755, 763-64 (1989)) (party may not be deprived of their legal rights in the first series of cases because they had neither intervened nor been joined as parties). The notice issued in *Noel* went to advocates for the handicapped, but it was not issued to taxi drivers or even to taxi driver advocacy groups. Indeed, when one trade group representing taxi fleet owners attempted to intervene, the TLC opposed their motion and the Court refused to allow it. Thus the stipulation of settlement, despite being so-ordered by the Court cannot be binding on

23

plaintiffs or members of the putative plaintiff class. While rulemaking would necessarily follow

the agreement, the TLC, by the settlement agreement, had assured that the rule would pass. To

impose serious burdens on plaintiffs based on the *Noel* settlement is denial of due process.

### III.   THE TLC'S FORCED CONVERSION PROGRAM IS NOT NECESSARY TO SERVE THE PUBLIC INTEREST AND WILL DO IRREPARABLE HARM TO PLAINTIFFS

The TLC's forced conversion program is not necessary to serve the public interest and

will do irreparable harm to plaintiffs. As a general matter, there is a presumption of irreparable

harm when there is an alleged deprivation of constitutional rights. *See Brewer v. W. Irondequoit*

*Cent. Sch. Dist.*, 212 F.3d 738, 744-45 (2d Cir. 2000); *Charette v. Town of Oyster Bay*, 159 F.3d

749, 755 (2d Cir.1998); *Rathgaber v. Town of Oyster Bay*, 492 F. Supp. 2d 130, 139 (E.D.N.Y.

2007). While this general rule may not govern every case, here irreparable harm may also be

found because the damages flowing from the violation would be difficult to ascertain and

measure. *See Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *Ticor Title Ins. Co. v. Cohen*,

173 F.3d 63, 68-69 (2d Cir. 1999). More particularly, once an independent medallion owner is

forced to purchase and retrofit his taxi, that action cannot be readily undone. The city will not

stand ready to replace it with a non-wheelchair taxicab. And if plaintiffs are required to convert

to wheelchair cabs, as in *Ticor Title*, "[I]t would be very difficult to calculate monetary

damages" to cover the loss of both income and the investment value in the medallion. 173 F.3d

at 69; *see also Robinson-Pitts v. Bd. of Educ. of City of New York*, 544 F. Supp. 187, 188

(E.D.N.Y. 1982).

The public interest also favors plaintiffs because there is no evidence or reason to believe

that the city in general or wheelchair users in particular require hundreds or thousands more

wheelchair-accessible taxicabs. The *Noel* settlement calls for half of all yellow taxis to be

accessible. But that ratio is entirely arbitrary. Why not a quarter? Or three-quarters? Or one-tenth? And why 50% of all yellow cabs, but *zero* percent of black cabs?

The TLC admits that its subsidized citywide Accessible Dispatch Program dispatches just 144 trips per day. TLC 2014 Annual Report at 16, PX 46. There is no indication that the demand for accessible taxis is not being readily met by the existing fleet. And if more accessible taxis were needed, there is no rational basis for imposing the entire burden on yellow taxis, and disproportionately on randomly selected independent medallion owners.

The city and the TLC, of course, have statutory authority to issue up to 1,600 additional wheelchair medallions. But they have not done so. Until they do, it is not just irrational, but gratuitous to insist that owners of unrestricted medallions convert to wheelchair vehicles. In short, plaintiffs are being denied due process of law and equal protection of the law with the result being a clear and present threat to their livelihoods and to their economic security. The plan should be enjoined.

## CONCLUSION

The TLC and the city have denied individual medallion owners due process of law and equal protection of the law and have caused them irreparable harm. For these reasons, plaintiffs' motion for a preliminary injunction should be granted.

Dated:  October 29, 2015
       New York, New York

                                      /s/_____

Andrew St. Laurent                            Daniel L. Ackman
Harris, O'Brien, St. Laurent &            Law Office of Daniel L. Ackman
Chaudhry LLP                          222 Broadway, 19th Floor
111 Broadway, Suite 1502               New York, NY 10038
New York, NY 10006                    Tel: 917-282-8178
Tel: (646) 248-6010                     d.ackman@comcast.net
andrew@harrisobrien.com

                                       *Attorneys for Plaintiffs*