UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

JASWINDER SINGH, BALBIR NAGI,
MAN SINGH and NYC YELLOW CAB
DRIVERS ASSOCIATION, INC.,

           Plaintiffs,

   -against-

MEERA JOSHI, THE NEW YORK
CITY TAXI AND LIMOUSINE
COMMISSION, BILL DE BLASIO and
THE CITY OF NEW YORK,

          Defendants.

-------------------------------------------------x

**<u>MEMORANDUM AND ORDER</u>**
No. 15-CV-5496-FB-VMS

*Appearances:*
*For the Plaintiffs:*
DANIEL L. ACKMAN, ESQ.
222 Broadway, 19th Floor
New York, New York 10038

ANDREW ST. LAURENT, ESQ.
Harris, St. Laurent &Chaudhry LLP
40 Wall Street, 53rd Floor
New York, New York 10005

*For the Defendants:*
ZACHARY W. CARTER, ESQ.
Corporation Counsel of the
City of New York
100 Church Street
New York, New York 10007

By:   SHERYL NEUFELD, ESQ.
      MICHELLE GOLDBERG-CAHN,
      ESQ.
      KAREN SELVIN, ESQ.
      SAMANTHA SCHONFIELD, ESQ.

*For Amici Curiae The Taxis for All
Campaign, The 504 Democratic Club, and
Disabled in Action*
DANIEL L. BROWN, ESQ.
Sheppard, Mullin, Richter & Hampton
30 Rockefeller Plaza
New York, New York 10112

**BLOCK, Senior District Judge:**

In December 2013, the New York City Taxi and Limousine Commission ("TLC") settled a lawsuit challenging its compliance with the Americans with Disabilities Act ("ADA") by committing to "adopt regulations requiring that half of the city's more than 13,000 yellow cabs be accessible to people with disabilities within six years." Benjamin Weiser & Matt Flegenheimer, *City Agrees on Access to Taxis for Disabled*, N.Y. Times, Dec. 6, 2013, at A29. Adopted the following April, the regulations came at a cost. In the main, that cost is to be borne by the individual owners of the medallions required for the operation of a yellow cab.

Plaintiffs—three individual medallion holders and an umbrella organization representing others—argue that the regulations violate the Constitution and other applicable laws. They seek a preliminary injunction barring enforcement on the grounds that the regulations violate the constitutional guarantees of due process and equal protection. For the following reasons, the Court disagrees and denies the request for preliminary injunctive relief.

## I

### A.  Background to the Regulations

As noted, the challenged regulations owe their existence to a lawsuit. In January 2011, disabled individuals and advocacy groups filed a class action against TLC in the Southern District of New York. *See Noel v. New York City Taxi &*

*Limousine Comm'n*, Case No. 11-CV-237 (S.D.N.Y. filed Jan. 13, 2011). They

alleged that wheelchair-accessible vehicles comprised only 1.8% of the city's yellow

cab fleet, and argued that TLC was violating the ADA and other federal and local laws

by failing to require more.

Title II of the ADA addresses disability discrimination in the provision of

public services. *See* 42 U.S.C. §§ 12131-12165. The plaintiffs in *Noel* invoked two

subsections of Title II: Part A applies to public services generally, and provides that

"no qualified individual with a disability shall, by reason of such disability, be

excluded from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such entity." *Id.*

§ 12132. Part B applies that general prohibition to public transportation systems; it

provides, in relevant part:

> If a public entity operates a demand responsive system, it shall be
> considered discrimination . . . for such entity to purchase or lease a new
> vehicle for use on such system . . . that is not readily accessible to and
> usable by individuals with disabilities, including individuals who use
> wheelchairs, unless such system, when viewed in its entirety, provides
> a level of service to such individuals equivalent to the level of service
> such system provides to individuals without disabilities.

*Id.* § 12144.

On cross-motions for summary judgment, Judge Daniels held that TLC was not

subject to the public-transportation provisions of the ADA because it did not "operate"

a transportation system. *See Noel v. New York City Taxi & Limousine Comm'n*, 837

3

F. Supp. 2d. 268, 273-76 (S.D.N.Y. 2011). However, he held that it was violating Part A's general prohibition. He reasoned that "[t]he acknowledged lack of meaningful access is a direct result of the policies, practices, and regulations of the TLC," *id.* at 278—in particular, TLC's authority over the types of vehicles that can be used as yellow cabs, *see id.* ("The TLC has admitted that it has both the ability and authority to provide more wheelchair accessible vehicles, but it has chosen not to do so.").

The Second Circuit vacated and remanded. *See Noel v. New York City Taxi & Limousine Comm'n*, 867 F. 3d 63 (2d Cir. 2012). It held that TLC "does not violate the ADA by licensing and regulating a private taxi industry that fails to afford meaningful access to passengers with disabilities" because "TLC's control over the taxi industry, however pervasive it is at this time, does not make the private taxi industry a program or activity of a public entity." *Id.* at 72 (internal quotation marks omitted). The circuit court further reasoned that TLC's failure to use its regulatory authority to require more wheelchair-accessible vehicles could not violate the ADA "because Title III [of the ADA] expressly exempts taxi providers from purchasing or leasing 'accessible automobiles.'" *Id.* at 73. Thus, "[i]f the TLC is required . . . to ensure that the taxi industry provides a sufficient number of accessible taxis, then private taxi owners would be required to purchase or lease accessible taxis even though the ADA explicitly exempts them from such requirements." *Id.* at 73-74.

On remand, the plaintiffs obtained leave to amend their complaint to allege that TLC's choice of vehicle as the "Taxi of Tomorrow" was a van and, therefore, outside the scope of the exemption relied on by the Second Circuit.[1] TLC initially contested the allegation, but eventually reached a settlement with the plaintiffs. TLC promised to propose rules requiring 50% of the yellow cab fleet to be wheelchair-accessible by 2020. The settlement was entirely a product of negotiations between the *Noel* plaintiffs and TLC; no medallion owners or taxi trade groups were invited to participate.

## B. The Regulations and their Adoption

Understanding the regulations TLC undertook to adopt requires some context. TLC's regulatory authority extends to many types of for-hire vehicles. Three—conveniently color-coded—are relevant here.

First, TLC regulates New York City's iconic yellow cabs, of which there are currently about 13,500. Yellow cabs may accept street hails citywide, may not refuse a hail to any destination in the city, and operate on a fare schedule set by regulation.[2]

---

[1] TLC's "Taxi of Tomorrow" program—which requires that all new yellow cabs be Nissan NV200s—was itself a source of extensive political and legal battles. *See* Emma G. Fitzsimmons, *Top State Court Backs New York City's 'Taxi of Tomorrow'*, N.Y. Times, June 26, 2015, at A22.

[2] TLC recently authorized yellow cabs to respond to "e-hails" made through certain approved mobile apps.

TLC designates the makes and models approved for use as yellow cabs, *see supra* note 1, and mandates that each yellow cab be retired and replaced with a new vehicle every three to seven years.

Yellow cab medallions come in two varieties. A "corporate" or "minifleet" medallion authorizes the holder to operate an unlimited number of yellow cabs, while an "independent" or "individual" medallion authorizes the holder to operate only one. Each variety is further subdivided into one of three classifications: An "unrestricted" medallion authorized—at least until the challenged regulations were adopted— the use of any TLC-approved vehicle. An "alternative fuel" medallion requires the use of a natural-gas or hybrid vehicle. An "accessible" medallion requires the use of a wheelchair-accessible vehicle.

The number of yellow-cab medallions is limited by law. As a result of their limited number, medallions are bought, sold and leased in a robust secondary market; pledged as collateral for purchase-money mortgages; and even transferred by inheritance and bequest. When authorized to do so, TLC sells new medallions at auction; it has always conducted separate auctions for each variety and classification.

Second, TLC licenses livery cabs, limousines and other so-called black cars. There is no fixed number of black-car licenses, and their number has drastically increased due to the popularity of services such as Uber. Black cars are forbidden from accepting street hails; transportation must be prearranged by the passenger

through a central dispatcher.  Fares are not regulated, but must be filed with TLC.

TLC does not regulate the types of vehicle that may be used for black cars, but does

require licensees to provide a wheelchair-accessible vehicle on request.[3]

Third are the green "boro cabs," which first appeared in August 2013.  *See* Matt

Flegenheimer, *All-Borough Taxis (Like Yellow Cabs, but Green) Hit the Streets*, N.Y.

Times, Aug. 10, 2013, at A16.  Boro cabs may accept prearranged fares like a black

car, but they may also accept street hails in areas traditionally underserved by yellow

cabs.  The number of boro cabs is capped by law at 18,000, of which half will

eventually be required to be wheelchair-accessible.  *See Greater N.Y. Taxi Ass'n v.*

*New York*, 21 N.Y.3d 289, 298-99 (2013).

The regulations proposed and later adopted by TLC apply only to unrestricted

yellow-cab medallion holders; they do not apply to either black cars or boro cabs.  In

addition, they apply differently to individual and corporate medallions.  Holders of

unrestricted *corporate* medallions will be required to replace 50% of their fleets with

accessible vehicles on an alternating basis.  In other words, the first car to come up for

---

[3]Traditional black-car companies accommodate such requests through their
central dispatches.  The "WAV" option on Uber's mobile app allows users to
request a wheelchair-accessible boro cab, discussed *infra*; it is unclear if and how
Uber complies with the mandate to provide an accessible vehicle in areas where
boro cabs cannot make pickups.  *See* Annie Karni, *Uber Blasted Over Disabled*,
N.Y. Daily News, Jan. 27, 2015, at 14.

mandatory retirement will have to be replaced with an accessible vehicle; the second will not.

Half of the holders of unrestricted *individual* medallions will also have to replace their vehicle with an accessible vehicle. Since, by definition, individual medallion holders have only one vehicle, the system applicable to corporate medallion holders cannot apply. Instead, the regulations contemplate lotteries. All medallion holders whose vehicles will come up for mandatory retirement during a particular lottery period (January 1-June 30 and July 1-December 31 of each year) will be entered; 50% will be chosen. Those chosen will have to replace their vehicle with an accessible one when their vehicle comes up for retirement; those not chosen will have to replace their vehicle with an accessible one *the next time* their vehicle comes up for retirement.

Once the process is underway, half of individual medallion owners will, at any particular moment, be slated to replace a non-accessible vehicle with an accessible one, while the other half will be slated to replace an accessible vehicle with a non-accessible one. Over time, the result will be an individual-medallion fleet that is—like the corporate-medallion fleet—50% accessible. Thus, the lotteries do not result in "winners" and "losers" because all individual medallion holders will have to purchase an accessible vehicle every other time their vehicle comes up for retirement. The

lotteries determine only which medallions holders will start with an accessible replacement and which will defer it.

Regulations to implement the foregoing scheme were first proposed in December 2013. After a change of administrations at City Hall, the proposal was amended to include a 30-cent surcharge on every yellow cab ride. Five cents of every surcharge is to go to the driver; the balance is to be paid into a Taxicab Improvement Fund. TLC estimates that the fund will be sufficient to reimburse medallion holders up to $14,000 for each accessible vehicle purchased, plus up to $16,000 over four years for maintenance and other operational costs.

The amended rules were proposed and published in March 2014. After a thirty-day comment period, TLC took up the proposal at a public meeting held on April 30, 2014. The meeting—almost all of which was devoted to the proposed regulations—lasted three hours and included statements from some 37 speakers. Individual medallion owners and other industry representatives voiced their concerns about the increased cost and burden of operating accessible vehicles.

At the conclusion of the comments, the commissioners unanimously approved the regulations. The 30-cent surcharge took effect on January 1, 2015, while the

regulations requiring vehicle replacement apply to vehicles replaced after January 1, 2016.[4]

## C.  The Present Lawsuit

TLC conducted the first lottery of independent medallion holders in June 2015; the three individual plaintiffs were among those chosen.  By letters dated August 17, 2015, TLC informed each plaintiff that he would be required to purchase an accessible vehicle when his current vehicle came up for mandatory retirement.  The retirement dates are April 13, 2016, for plaintiff Man Singh, May 26, 2016, for plaintiff Balbir Nagi, and October 6, 2016, for plaintiff Jaswinder Singh.

On September 22, 2015, the three individual plaintiffs filed suit against TLC, its chairperson, Meera Joshi, the City of New York and Mayor Bill De Blasio.  They were joined by NYC Yellow Cab Drivers Association, Inc. ("NYCYCDA"), which purports to represent owner-drivers of yellow cabs and, in particular, those who do not wish to replace their vehicles with accessible ones.  NYCYCDA alleges that some of its members will be required to replace their vehicles in 2016.

Collectively, the plaintiffs allege that the regulations impose noneconomic and economic burdens on them.  They claim that the accessible vehicles are less

---

[4]Once the regulations were adopted, the parties in *Noel* sought approval of the class-action settlement.  After directing notice to the class and conducting a fairness hearing, Judge Daniels approved the settlement on September 16, 2014.

comfortable to drive for long periods, and more expensive to purchase, maintain and operate. These disadvantages, in turn, make their medallions and vehicles less desirable and, therefore, worth less than an unrestricted medallion and vehicle in the secondary market. They acknowledge the Taxicab Improvement Fund, but note that there is currently no guaranteed amount or mechanism for payment. In addition, they allege that payments from the fund, as anticipated, would be insufficient to compensate them for their losses, in particular the lost income from the lease and/or sale of their medallions.

Plaintiffs' assert three federal claims: (1) that the regulations violate the Due-Process Clause of the United States Constitution, (2) that the regulations violate the Equal Protection Clause of the United States Constitution; and (3) that the regulations amount to an unconstitutional taking of private property without just compensation. They also assert due-process and takings claims under the New York Constitution, and a challenge to the regulations under Article 78 of the New York Civil Practice Law and Rules.

Once served, the defendants filed a letter motion to transfer the case to the Southern District of New York as "related" to *Noel*. Shortly thereafter, the plaintiffs sought a preliminary injunction by order to show cause; the requested injunctive relief pertains to their due-process and equal-protection claims only. Those two matters came before the Court on December 8, 2015, at which time the Court heard argument,

allowed the parties to submit additional briefing and reserved decision. The Court also encouraged the parties to submit a statement of undisputed facts to obviate the possible need for an evidentiary hearing. They met with some degree of success and submitted a lengthy stipulation, on which the foregoing recitation of facts is based.

## II

Before turning to the merits of plaintiff's preliminary injunction request, the Court must address three threshold matters. Since each is distinct from the merits, the Court may address them in any order. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." (citations and interal quotation marks omitted)). None requires extended discussion.

### A. Transfer

As noted, the defendants argue that this case should be transferred to the Southern District because it is related to *Noel*. While both the Eastern and Southern Districts have local rules governing the assignment of related cases to judges within their respective courts, there is no mechanism for transferring a case pending in one court to a particular judge in the other. Therefore, the Court construes the defendants' request as a motion to change venue "for the convenience of the parties and witnesses, in the interest of justice" pursuant to 28 U.S.C. § 1404(a).

None of the factors typically invoked as warranting a change of venue is especially relevant here. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (listing factors). Simply put, no concern of convenience is sufficiently weighty—given the proximity of the two courts—to overcome the plaintiffs' choice of forum, "a decision that is given great weight." *Id.* at 107 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981)).

The Court respects, of course, the need to avoid meddling in a fellow district judge's cases, and the concept of "the interest of justice" is surely broad enough to account for such concerns. That said, the Court disagrees with the defendants' assessment that retaining this case would interfere with Judge Daniels's supervision of the settlement in *Noel*.

Judge Daniels exercises jurisdiction to enforce a settlement between TLC and disabled individuals; plaintiffs and their colleagues are strangers to that agreement. No notice of the settlement was specifically addressed to drivers, and when one association of corporate medallion owners requested leave to intervene, the request was denied. Although Judge Daniels apparently entertained objections to the settlement, he did not pass on any constitutional issues.

Enforcement of the settlement is a conceptually distinct matter from plaintiffs' constitutional objections to the regulations resulting from it. Were the Court to find the regulations constitutional, enforcement of the settlement would remain a matter

for Judge Daniels. Were the Court to conclude that the regulations are constitutionally infirm, the litigation before Judge Daniels would resume its course. In neither case would the Court be interfering with Judge Daniels's jurisdiction. Therefore, the Court declines to transfer this case to the Southern District.

## B. Standing

Defendants argue that the plaintiffs have not suffered an injury-in-fact, one of the elements of "the irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal quotation marks and citations omitted). The defendants argue that some of the claimed consequences of switching to an accessible vehicle—such as increased discomfort and decreased value in the secondary market—are speculative.

There is no dispute, however, that the challenged regulations require the plaintiffs to make the switch in the near future or face sanctions. This choice is itself sufficient to confer standing, whether or not all of the consequences predicted by the plaintiffs come to pass. "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007)

(emphasis omitted). Rather, a plaintiff may satisfy the injury-in-fact requirement by demonstrating "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," as long as there is a "credible threat of prosecution thereunder." *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979). While the constitutional interest at stake is often grounded in the First Amendment, *see, e.g., id.*, it is clear that claims like those raised by the plaintiffs also suffice. *See Craig v. Boren*, 429 U.S. 190, 195 (1976) (equal-protection challenge); *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (due-process challenge).

In any event, one consequence of the switch is the increased cost of an accessible vehicle. Defendants do not dispute that this is a concrete injury, but argue that it will be entirely offset by disbursements from the Taxicab Improvement Fund. As the plaintiffs point out, however, there is currently no timetable for disbursements and no guarantee that any eventual disbursement will completely cover the increased cost. Thus, the promise of reimbursement is more speculative than the plaintiff's injuries. *Cf. Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 76 (1965) ("[T]he mere contingency that the Attorney General might revise the regulations at some future time does not render premature [the plaintiffs'] challenge to the existing requirements.").[5]

---

[5]Since there are plaintiffs with standing to seek preliminary injunctive relief, NYCYCDA's standing—which the defendants also challenge—is not a matter of

## C. Laches

Finally, defendants invoke the doctrine of laches, which "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 2007) (citation and internal quotation marks omited). That is, having just argued that the plaintiffs sued before they had suffered any concrete injury, the defendants now argue that they waited too long.

Defendants offer many earlier dates when the plaintiffs might have sued: December 2013, when the *Noel* settlement was made public; April 2014, when the challenged rules were adopted; June 2015, when the first lottery and its results were announced. While these events likely came to the attention of the medallion owner community at large, the individual plaintiffs were first notified that they, in particular, would be required to take some action on or about August 17, 2015. They promptly filed suit just over a month later.

---

urgency. The Court notes, however, that "an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). Therefore, NYCYCDA will, in the normal course of the litigation, have to establish its own standing by offering evidence that the regulations have caused "a perceptible impairment of [its] activities." *Id.* at 157. As matters now stand, there is no evidence that NYCYCDA would have preferred to expend resources on anything other than its challenge to the regulations.

Even if the individual plaintiffs had had notice of earlier events, their conduct would not have been unreasonable. It would have been premature for them to file suit before the lottery because they would not have known before then that they would be required to make the switch in the near future. While the defendants argue that all entrants knew that they would *eventually* have to do so, there is a difference between a requirement to do something within, at most, a year and a requirement to do something three to seven years from now—a difference that would lead a reasonable person to wait and see which group he fell into before taking action. And even if the individual plaintiffs could be charged with immediate knowledge of the lottery results, three months is hardly an unreasonable amount of time to mount a legal challenge.

In sum, the Court finds none of the defendants' threshold arguments persuasive. Accordingly, it turns now to the merits.

### III

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Since preliminary injunctions are, almost by definition, sought during the early stages of a lawsuit, an evidentiary hearing will often be necessary to develop

the factual premises for the requested relief and, if necessary, resolve any disputes of fact.

Here, however, the parties have agreed that the central issues in dispute are legal in nature. To that end, they have provided the Court with stipulated facts. Their efforts avoid the need for an evidentiary hearing.

That there are no material facts in dispute presents another issue. One of the reasons preliminary injunctive relief is preliminary is that it is based on a provisional record. Thus, the plaintiff need only show a *likelihood* of success on the merits. That is patently different than actual success on the merits. It is possible, therefore, for a plaintiff to make the requisite showing for a preliminary injunction based on available facts, but to eventually lose on the merits due to facts developed during discovery. Conversely, where the facts have not changed between the preliminary-injunction stage and consideration of the merits, there is little reason for a court not to adopt its preliminary ruling as its final one. *See PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 7 (D.D.C. 2004) (calling the procedure "especially appropriate if the party requesting summary judgment fails to adduce new evidence suggesting that the court should revisit its grant of a preliminary injunction").

In a case like this, in which the parties have agreed to stipulated facts, substantial time and effort could be saved by reaching the merits of the claims underlying the request for preliminary injunctive relief. The Supreme Court has

cautioned, however, that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Federal Rule of Civil Procedure 65(a)(2) assuages the Supreme Court's pronouncement somewhat by empowering a district court to "advance the trial on the merits and consolidate it with the [preliminary-injunction] hearing." But like Rule 12(d), which allows conversion of a motion to dismiss into one for summary judgment, Rule 65(a)(2) requires "clear and unambiguous notice . . . either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." *Camenisch*, 451 U.S. at 395 (citation and internal quotation marks omitted); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir. 1985).

The Court has not specifically invoked Rule 65(a)(2), and to do so now would impose unnecessary delay. Therefore, although the Court surmises that the likelihood of success on the merits—or, more accurately, the lack thereof—will ultimately be dispositive in this case, it will confine itself to plaintiffs' request for preliminary injunctive relief.

## A. Due Process

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d

147, 158 (2d Cir. 2011). The defendants concede that the plaintiffs have a property interest in their medallions. They dispute that a "deprivation" has occurred because the right to operate a yellow cab still exists, albeit subject to new terms and conditions. *Cf. id.* (suspension of taxi driver's license constituted deprivation of property). Even assuming a deprivation, however, the plaintiff's due-process claim fails at the second step.

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," but an opportunity to be heard remains the Due Process Clause's "root requirement." *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971).

Plaintiffs' due-process attack focuses on the process leading to the approval of the settlement in *Noel*, but that focus is misplaced. The initial settlement merely obligated TLC to initiate a rulemaking, which itself required notice and an opportunity for public comment. The final version of the settlement, which incorporated the challenged rules, was approved after the notice-and-comment period. "A party's due process rights are not violated when it may participate fully in an administrative

agency proceeding and later seek state-court review." *Liberty Cable Co. v. City of New York*, 60 F.3d 961, 964 (2d Cir. 1995). Although the record does not reflect that the individual plaintiffs personally participated, there is no claim that they were denied the opportunity to be heard during the notice-and-comment period. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 485 (1982) ("The fact that [the plaintiff] failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.").

The plaintiffs argue that the rulemaking merely presented the rules required by the *Noel* settlement as a *fait accompli.* It is true, of course, that a hearing required by the Due Process Clause "must be at a meaningful time and [conducted] in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citation and internal quotation marks omitted); *see also Air Transp. Ass'n v. National Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011) ("Decisionmakers violate the Due Process Clause and must be disqualified when they act with an unalterably closed mind and are unwilling or unable to rationally consider arguments."). The record here, though, reflects extensive input from many points of view. Moreover, the creation of the Taxicab Improvement Fund was a concrete response to concerns raised about the costs imposed by the new rules.

Finally, the plaintiffs cannot claim that they have been denied an opportunity for judicial review because their complaint here includes a claim under Article 78.

Even they do not suggest that judicial review of the regulations will be illusory.[6] For these reasons, the Court concludes that the rulemaking afforded a meaningful opportunity to be heard and, therefore, that the rules resulting from it comport with due process.

## B. Equal Protection

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Certain grounds for disparate treatment are singled out for heightened scrutiny. Race and national origin, for instance, "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy," *id.* at 440, while sex-based distinctions "very likely reflect outmoded notions of the relative capabilities of men and women." *Id* at 441. But even distinctions that are not suspect implicate "the

---

[6]District courts in this circuit routinely decline to exercise supplemental jurisdiction over Article 78 claims, *see*, *e.g, Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999), and some have gone a step further and held that they lack jurisdiction over them, *see, e.g., Cartagena v. City of New York*, 257 F. Supp. 2d 708 (S.D.N.Y. 2003). Should the Court either conclude that it cannot exercise jurisdiction over an Article 78, or decline, in its discretion, to do so, the plaintiffs will be able to pursue judicial review in state court. *See* 28 U.S.C. § 1367(d) (mandating tolling of statute of limitations during pendency of claims invoking district court's supplemental jurisdiction).

22

core concern of the Equal Protection Clause as a shield against arbitrary classifications." *Engquist v. Oregon Dept' of Agric.*, 553 U.S. 591, 598 (2008).

Thus, all governmental line-drawing must be "rationally related to a legitimate governmental purpose," and "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446. Still, rational-basis review is not an excuse for judicial policymaking and "requires deference to reasonable underlying legislative judgments." *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012).

The defendants' asserted goal of providing better taxi service to the disabled is, quite obviously, a legitimate governmental purpose. And its chosen means of achieving that goal—by mandating an increase in the number of accessible yellow cabs—is hardly irrational. Nevertheless, the plaintiffs argue that the new accessibility rules make several arbitrary distinctions and are, therefore, unconstitutional.

## 1. Yellow Cabs versus Black Cars and Boro Cabs

First, the plaintiffs challenge the decision to make only yellow cabs subject to the new rules. This decision is rational for a number of reasons. While TLC closely regulates the types of vehicles that can be used as yellow cabs and the length of time they can be used, the only requirement for black cars is that they pass a safety inspection. Given the substantial difference in the scope of TLC's regulatory

authority over black cars versus yellow cabs, it is not apparent that TLC could require black-car licensees to use a particular vehicle by a particular date even if it wanted to.

Moreover, yellow cabs—and only yellow cabs—can accept street hails everywhere in the five boroughs. The decision to impose new accessibility requirements on yellow cabs is, in this respect, simply a recognition that street hailing is a key component of the taxi transportation system, particularly in central Manhattan, where even boro cabs cannot respond.

To the extent that boro cabs do have some things in common with yellow cabs, there is nevertheless a rational basis for their disparate treatment. Wheelchair accessibility has been a consideration of the boro cab program since its launch in 2013, with large numbers of licenses set aside for accessible vehicles. Increasing the number of accessible yellow cabs—a far older part of the City's transportation system—on a similar timetable was bound to be more disruptive of settled expectations.

## 2. *Independent Medallions versus Corporate Medallions*

The plaintiffs next object to the distinction between owners of independent medallions and corporate medallions. In fact, both groups are subject to the same 50% requirement. To be sure, the benchmark applies differently to each group, but as then-Judge Scalia observed, rational-basis review "is no more severe than the realities of government permit." *United States v. Cohen*, 733 F.2d 128, 137 (D.C. Cir.

1984) (en banc) (Scalia, J.). Surely one of those realities is that a single vehicle cannot be made 50% accessible.

### 3. *Lottery Winners versus Lottery Losers*

Finally, the plaintiffs argue that the use of a lottery to determine which 50% of independent medallion holders will have to switch to an accessible vehicle is arbitrary. As the defendants point out, *all* independent medallion holders will eventually have to make the switch. As noted, however, the requirement to purchase an accessible vehicle now (or, at least, soon) is not quite the same thing as a requirement to do so three to seven years from now; if nothing else, the rules may change between now and then. Therefore, the Court concludes that the lottery does create two meaningfully different categories of independent medallion holders.

In a sense, a lottery is the very definition of an arbitrary selection procedure. But Judge Weinstein long ago recognized that, in some circumstances, selection by lot is—in Judge Scalia's words—one of the "realities of government":

> [C]hance is an element of most election procedures. The Archons of ancient Athens would undoubtedly have been surprised to learn that their selection by lot from among the citizenry was the result of an invidious discrimination. The various United States District Courts which have adopted random jury selection plans pursuant to Congressional mandate might be disturbed to find that in their efforts to secure to all an equal opportunity for jury service they have actually been violating the concept of equal protection. The new random selection system for selective service registrants is but another example of a process in which chance is utilized to ensure an equal distribution of rights and duties.

*Campbell v. Board of Educ.*, 310 F. Supp. 94, 103-04 (E.D.N.Y. 1970) (citations omitted). What was important, in Judge Weinstein's view, was participation on an

equal footing: "Each [voter] stands an equal opportunity of being benefitted or injured by the lottery . . . . There can be no denial of equal protection when all share an equal opportunity to have their votes count in an election." *Id.* at 103, 104.

The case before Judge Weinstein involved a lottery to determine the order in which ballots in a proportional-representation election would be counted. Still, his larger point applies here: There are times when selection by lottery actually insures a fairer outcome than some arguably less arbitrary mechanism precisely because it eliminates the possibility that improper considerations will infect the decision. A fair lottery, in those situations, will insure a fair outcome. *Cf. Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 172 (2d Cir. 1998) ("Warrantless drug urinalysis testing of employees in safety-sensitive jobs may be consonant with the Fourth Amendment where part of a systematic, uniformly applied testing program (such as random testing).").

The Court concludes that this is one of those times. No doubt TLC could have effectuated its goal of increased accessibility in the yellow cab fleet in many ways. It could have required half of medallion owners to convert, but not on a rotating basis, permanently exempting the other 50%. Or it could have simply required that each and every vehicle in the fleet become wheelchair-accessible.

Instead, TLC's decisions to set a goal of 50% accessibility, to include both corporate and individual medallion owners in that mandate, and to require all

individual owners to share the burden on a rotating basis, all reflect the balancing of interests that defines modern policymaking. The nature of independent medallion ownership (i.e., ownership of a single vehicle) required a mechanism for choosing which owners would bear that burden first. The use of a lottery, in which every owner was treated exactly like every other owner, entirely comports with equal protection.

## IV

For the foregoing reasons, the plaintiffs' request for preliminary injunctive relief is denied.

**SO ORDERED**.

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 26, 2016